**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**
_____

ALLEN HOWELL,                    :
                                           :
             Plaintiff,         :
                                           :
              v.             :          No. 5:17-cv-00075
                                         :
MILLERSVILLE UNIVERSITY OF    :
PENNSYLVANIA;                 :
MICHEAL HOULAHAN;         :
PHILLIP TACKA; N. KEITH WILEY;  :
CHRISTY BANKS; and DIANE UMBLE, :
                                         :
             Defendants.    :
_____

**O P I N I O N**
**Defendants' Motion to Dismiss the Third Amended Complaint in Part Against Millersville,**
**ECF No. 40 – Granted**
**Defendants' Motion for Summary Judgment, ECF No. 41 – Granted**

**Joseph F. Leeson, Jr.**                                **October 20, 2017**
**United States District Judge**


I.      **INTRODUCTION**


      Plaintiff Dr. Allen Howell filed this action against Millersville University of

Pennsylvania and several fellow members of the Millersville University Music Department: Dr.

Micheál Houlahan, Dr. Phillip Tacka, Dr. N. Keith Wiley, Dr. Christy Banks, and Dean Diane

Umble. Plaintiff alleges age discrimination and age-related hostile work environment against the

individual Defendants in their official capacities in violation of the Age Discrimination in

Employment Act ("ADEA"), 29 U.S.C. §§ 621-634; retaliation under the First Amendment

pursuant to 42 U.S.C. § 1983 against the individual Defendants in their individual and official

capacities; and aiding and abetting age discrimination and age-related hostile work environment

against the individual Defendants in violation of the Pennsylvania Human Relations Act

("PHRA"), 43 P.S. §§ 951-963. Presently pending are Defendants' Motion to Dismiss the Third

Amended Complaint in Part as to Millersville University, ECF No. 40, and Defendants' Motion

for Summary Judgment, ECF No. 41. For the reasons set forth herein, both motions are granted.

## II.    BACKGROUND

### A.    Procedural Background

Howell filed his Third Amended Compliant on August 22, 2017, alleging that he suffered

age discrimination when the Music Department of Millersville denied him a promotion, demoted

him from the position of Director of Choral Activities, and subjected him to two internal

investigations, and that various members of the Department retaliated against him for exercising

his First Amendment rights. ECF No. 39. Defendants filed their Motion to Dismiss the Third

Amended Complaint in Part on September 1, 2017, arguing that although Howell included

Millersville University of Pennsylvania as a defendant in the caption of his Third Amended

Complaint, he brings no claims against the University in any of the five counts of his Third

Amended Complaint. ECF No. 40. On the same day, Defendants filed their Motion for Summary

Judgment. ECF No. 41. Howell filed a Response to the Motion to Dismiss on September 15,

2017, ECF No. 54, and a Response to the Motion for Summary Judgment on September 22,

2017, ECF No. 57.

### B.    Factual Background

The following facts are either undisputed or viewed in the light most favorable to Howell,

the non-moving party.

From 1996 through the spring of 2014, Dr. Allen Howell taught music education and conducted non-auditioned choirs in the music department of Edinboro University. Defs.' Stat. Facts ¶ 1, ECF No. 41-1; Pl.'s Resp. to Stat. Facts ¶ 1, ECF No. 57. When he learned in late 2013 that Edinboro was retrenching him, Howell applied for the Director of Choral Activities position at Millersville University, a tenure-track position with the rank of Associate Professor. At the time that this position was advertised, Dr. Jeffrey Gemmell, an adjunct professor with a doctoral degree in choral conducting who is the same age as Howell, conducted Millersville's choirs. Howell Dep. 213:6, Pl.'s Ex. B, ECF No. 57-3.

Under the collective bargaining agreement with Howell's faculty union and the Pennsylvania State System of Higher Education (PASSHE), Howell's application was to be judged as to whether he was "minimally qualified" for the position, which was a very low standard. Defs.' Stat. Facts ¶ 5; Pl.'s Resp. to Stat. Facts ¶ 5; Houlahan Dep. 68:1-15, 95:18-98:21, Pl.'s Ex. H, ECF No. 57-12; Banks Dep. 40:1-12, Pl.'s Ex. D, ECF No. 57-8. The Music Department faculty assessed Howell's application first and the President of the University made the final decision. Defs.' Stat. Facts ¶ 7; Pl.'s Resp. to Stat. Facts ¶ 7; Houlahan Dep. 68:17-24. The Music Department concluded that Howell was not minimally qualified: faculty members expressed concerns about Howell's familiarity with the repertoire of choral music. Additionally, some faculty felt that Howell's degree did not qualify him for the position. The advertised position stated that a doctorate in choral conducting was "preferred," but that an applicant, at minimum, should have completed all the requirements for a doctorate in Choral Conducting except the dissertation. Banks Decl. ¶ 7; Banks Dep. 48-51; Defs.' Ex. D17, ECF No. 47-1. Howell has a Doctorate of Musical Arts with a primary concentration in Music Education and a secondary concentration in Choral Conducting. Howell Dep. at 20-21, 193; Pl.'s Ex. 98, p. 2,

ECF No. 57-7. Regardless, the President of the University found Howell to be minimally qualified and, against the Department's recommendation, offered him a position as Director of Choral Activities at the rank of Associate Professor with tenure. Defs.' Ex. 83, ECF No. 45-6.

In the fall of 2014, Howell began teaching the required credits per year, with extra pay for overloads. Houlahan Decl. ¶ 16, ECF No. 43-7. Howell directs the non-auditioned Men's Glee Club, a standard activity for a choral director. Prabhu Dep. 87: 23-24, Pl.'s Ex. M, ECF No. 57-17; Howell Dep. 68:4-8, 69:6-9. However, he does not conduct the Department's two auditioned choirs or the Women's Choir, which Gemmell still conducts. Gemmel Decl. ¶ 2, ECF No. 43-6.[1] Gemmell states that these three groups "perform a more extensive, complex repertoire at a consistently higher level of musicality than the level of the Men's Glee Club," which aims at a "fun-based experience more than curriculum-based learning." *Id.* In November, Howell met with Defendant Dr. Micheál Houlahan, Chair of the Music Department, concerning critical comments from students and faculty about Howell's performance. Defs.' Stat. Facts ¶ 18; Pl.'s Resp. to Stat. Facts ¶ 18. Howell reiterated his credentials to Chair Houlahan and asked to direct the more advanced choral ensembles in addition to the Men's Glee Club. *Id.* In December 2014, Howell and Dr. Toney, another retrenchee hired at the same time as Howell, met with Defendant Dean Diane Umble and complained about Chair Houlihan's micromanagement of the Department and course assignments. Defs.' Exs. 142, 142A, ECF Nos. 45-15, 45-16.

In June 2015, Howell sent an email to the entire Music Department and Dean Umble, stating that he refused to comply with the Department policy requiring students to buy specific lecture notes to defray the cost of live concerts and objected to the requirement that the students

[1] Gemmell, who had the position of Director of Choral Activities for three years and is the same age as Howell, was replaced in that role by Dr. Boyle, who held the position for two or three years before he resigned in 2013. Houlahan Dep. 38, 51-52.

attend those concerts. Defs. Exs. 5, 8, ECF No. 44-1; Wiley Dep. 116-119, ECF No. 42-9; Umble Dep. 196-199, ECF No. 42-8. By November 2015, the Dean's office knew of three complaints about Howell's Popular Music Class: one concerning an explicit and violent music video he had shown in class, another complaining about his unstructured teaching style and open syllabus—and changing that style to "appease" Chair Houlahan on the day he observed class—and a third complaint alleging Howell's inappropriate behavior with his significant other while manning a recruitment table at a school event. Defs.' Ex. 94, ECF No. 45-9; Defs.' Exs. D7, D8, D9, ECF No. 46-1. Dean Umble and Howell met to discuss the complaints, and Dean Umble reported the results to Provost Prabhu, who considered Howell's teaching style unorthodox. Defs.' Exs. 94, D9.

In Fall 2015, Howell applied for promotion to full professor. Defs.' Ex. 144, ECF No. 45-17; Defs.' Ex. D13, ECF No. 47-1. Promotion criteria as listed in the Millersville University Promotion Statement include: (1) outstanding teaching, (2) service to the department and the University, and (3) evidence of scholarly program with sustained accomplishments in peer-reviewed scholarship. Prabhu Decl. ¶ 10, ECF No. 43-9; Defs.' Ex. 65, ECF No. 44-8. The Department's professional development committee reviewed Howell's application; the committee included Defendant Dr. N. Keith Wiley and Defendant Dr. Phillip Tacka. Wiley Dep. 140-141, 160. Because Howell had only been at Millersville for two years, and the prerequisites for promotion ordinarily required five years as an associate professor, the committee considered his application under the "Exceptional" clause, which allowed unusually qualified candidates early promotion if they met the levels of expectation in all three of the promotion criteria and exceeded them in two out of the three. Defs.' Exs. 22, 23, ECF No. 44-2; Millersville University Promotion Statement p. 8, attached to Prabhu Decl. The committee unanimously recommended

against promotion, concluding that Howell's documents included student evaluations from only four classes he taught as opposed to the required five, and that although Howell's CV listed various professional activities, only four of them occurred in the previous four years, and he presented no documentation to support them. *Id.* Chair Houlahan and Dean Umble both agreed with the committee. Defs.' Exs. 23-24, ECF No. 44-2; Umble Dep. 219:10-14, 227:1-228:2. Lastly, the University-wide promotion and tenure committee considered Howell's application independently and unanimously determined not to recommend him for promotion. Defs.' Stat. Facts ¶ 38; Pl.'s Resp. to Stat. Facts ¶ 38; Defs.' Ex. 32, ECF No. 44-3.

In 2016, Howell was the subject of an "Article 43" investigation, carried out pursuant to Article 43 of the Collective Bargaining Agreement to resolve a complaint against Howell.[2] DeSantis Decl. ¶¶ 2-3, ECF No. 43-3. The complaint alleged that Howell had provided insufficient supervision to two student teachers, one of whom complained that she did not receive any written feedback. DeSantis Dep. 119:9-120:1. The second incident of inadequate supervision resulted in a loss of student music teacher placement at the particular school involved. Defs.' Exs. 33, 35, ECF No. 44-3; DeSantis Decl. ¶ 3; Umble Dep. 267:15-268:12. Howell explained that his practice, in keeping with his educational philosophy, involved group meetings where he gave verbal feedback to the student teachers he supervised. DeSantis Dep. 122-14. No discipline was imposed, and Howell agreed that he would provide proper feedback in the future as required. DeSantis Decl. ¶ 3.

In March 2016, several members of the Music Department faculty met with Human Resources Director DeSantis and Dean Umble to share their concerns about Howell, the

---

[2] Although the term "Article 42 investigation" also appears on the record, it refers to the same type of investigation. The article number changed under a new collective bargaining agreement. DeSantis Decl. ¶ 2.

circumstances of his hiring, his issues with student teaching, his interactions with other faculty members, and their concerns about his hostility. Pl.'s Ex. 66, ECF No. 57-6; Umble Dep. 248:17-21.

At a Department meeting in May 2016, Chair Houlihan made a statement to the effect that the Department had no Director of Choral Activities to assist with recruiting, but Howell responded that he was the Director of Choral Activities. Wiley Dep. 77:9-78:10. A subsequent grievance Howell filed under the Collective Bargaining Agreement lists the date of the meeting as the date he became aware of age discrimination, although no evidence in the record suggests that age was discussed at the meeting. Wiley Dep. 77:9-14, Defs.' Ex. D12, ECF No. 47-1.

Between spring 2014 and spring 2016, Tacka made several comments about wanting "young and energetic" or "young and charismatic" people in the positions of Director of Choral Activities and Director of Bands for student recruiting purposes. Howell Dep. 122:15-123:23, 124:3-14, 126:12-24, 127:3-7; Tacka Dep. 139:8-140:16, 267:21-268:6; Wiley Dep. 31:1-14. The first time, at a faculty meeting, Banks and Wiley corrected Tacka, stating that the Department should not focus on a candidate's age, but rather the person's qualifications, which could include charisma and energy. Houlahan Dep. 158:16-24, 160; Wiley Dep. 31:1-32:1; Banks Dep. 160:6-14. Chair Houlahan, Wiley, and Tacka testified that Tacka immediately accepted the correction and clarified that he meant to say charismatic, not young. Wiley Dep. 31:16-20; Houlahan Dep. 159:15-23; Tacka Dep. 139:12-140:16. Howell recalls that Tacka said "young" on two other occasions, but that Chair Houlahan corrected him both times. Howell Dep. 124:17-22. Chair Houlahan and Wiley claim they never heard a discussion about the age of candidates; Howell disputes this and states that they admitted to hearing Tacka's comments about the Department wanting a young person. Houlahan Dep. 71:24-72:1; Wiley Dep. 26,

91:23-92:3, 93:15-19; Pl.'s Stat. Facts ¶ 48 (citing Houlahan Dep. 158:16-22; Wiley Dep. 31:1-12).

The Music Department contends that they no longer use the title "Director of Choral Activities" to avoid confusion with the position of director of the University's honors college, and use the title "coordinator" instead. Defs.' Stat. Facts ¶ 49 (citing Banks Dep. 164:12-165:21, 192:20-24). Howell disputes this and points to the Millersville website which, as of May 2017, listed Gemmel's position as "Interim Director of Choral Activities." Pl.'s Ex. 40, ECF No. 57-5. Howell also points out that Banks did not recall the use of title "coordinator" in the Department prior to Howell's arrival, and stated that she did not know any other PASSHE school that uses the title "Coordinator of Choral Activities." Banks Dep. 165:12-14, 192:2-7.

Also in May 2016, Chair Houlahan wrote to Dean Umble to document Chair Houlahan's attempts to mentor Howell, observing that "[i]t appears that Dr. Howell feels that the department has 'an ax to grind,'" noting that Howell had not attended informational sessions about the University's expectations for faculty supervisors of student teachers, such that "[i]t is unclear as to how Dr. Howell has the knowledge to supervise student teachers without attending these meetings." Defs.' Ex. 72, ECF No. 45-2. Chair Houlahan also stated that based upon past performances, the Department of Music did not believe Howell possessed the skills to be Director of Choral Activities, and documenting complaints from students about Howell's inadequate academic advising. *Id.*

In February 2017, the University initiated another Article 42/43 investigation of unprofessional conduct by Howell. Pl.'s Ex. 57, ECF No. 57-6; DeSantis Dep. 180, ECF No. 42-2; Prabhu Dep. 103. The allegations against Howell included an unprofessional response to a student question, poor classroom management during a class discussion, unprofessional social

media posting about a student, and communicating information with his Popular Music class that had no relation to the subject matter. The University provided Howell with evidence of the allegations in a letter dated April 5, 2017. Pl's. Ex. 57. The evidence included an email that a student in Howell's Popular Music class sent to Chair Houlahan on February 15, 2017, expressing a concern about how Howell had treated another student during the previous class session. The email stated:

> I'm currently taking Pop Music with Dr. Howell, and so far every class we have had he hasn't taught much, if anything about pop music…thus far he has taught everything, but pop music. Subjects have included Satanism and religion, politics (particularly his own political views), anarchy, Trump, the university being a racket, and fighting the establishment. While I understand that these are all fascinating subjects to him, the fact is that he isn't teaching the designated subject. His reply to me was to more or less blow me off and say that that is how he teaches and feels that it is more important.

*Id.* The email then described how in the previous session, when another student had expressed similar confusion as to how a political video Howell showed related to pop music, Howell responded in a condescending manner and berated the student for questioning his teaching method. *Id.* The email stated that "Howell attempted to make the kid feel stupid and basically had the class laughing at him," and described such behavior as "absolutely unprofessional and unacceptable for a university professor." *Id.* The evidence also included a Facebook post dated the same day as the in-class incident that Howell made on a Facebook page entitled "Howell's Students Ask Each Other Questions." Howell had created the page as an online forum for the Popular Music class, and stated:

> Is it not ironic when students want to narrow the focus/scope of their education? It seems to me, when I hear students protest that their educational experiences are too broad (e.g., Why don't we just focus on pop music? Why do we have to focus on the larger issues?), it puts them right where the owners of society want them to be. The rulers do not want citizens capable of critical thinking or citizens who understand the larger issues behind the mundane affairs that we are "supposed" be [sic] thinking about. Musicians, however, consistently address larger issues. If we

want to understand their music, we too must address the underlying issues. If students want a fluffy class, they need a different teacher and that is certainly their right. They do not have the right, however (no matter how much they paid for their education) to attempt diminish [sic] the academic freedom (i.e., 1st Amendment rights) of their teachers.

Pl.'s Ex. 57 pp. 5-6, ECF No. 57-6; Pl.'s Stat. Facts. ¶ 53. The investigation expanded in April to include a victimization complaint by the second student. Defs.' Stat. Facts ¶ 53. This investigation has not yet concluded. Defs.' Stat. Facts ¶ 53; Pl.'s Stat. Facts. ¶ 53.

On April 27, 2017, Howell posted an entry on his Tumblr blog, "Musings," entitled, "On Power in the MU Music Department. Defs.' Ex. 62, ECF No. 44-7. The post states that he writes "to share my perspective for the purpose of making a positive contribution to the future success of the department." *Id.* Howell then discusses issues he perceives with Chair Houlahan and Tacka's leadership of the Department, accusing them of heavy-handed micromanagement of the faculty designed to maintain control of the Department. *Id.* Howell contends that Chair Houlahan has tried to keep the ratio of tenured faculty to adjunct faculty low, because younger adjuncts have less political clout and thus pose less of a threat to Houlihan and Tacka's control. *Id.*

Significantly, the record contains no evidence that any of the Defendants saw the post: Dean Umble did not see it until her deposition on July 20, 2017. Umble Dep. 205:15-16. Drs. Wiley and Banks testified that they did not see it. Wiley Dep. 122:7-123:1; Banks Dep. 221:10-15, 223:21-22. Banks also noted that she was unaware of any criticism of Howell because of his social media postings. Banks Dep. 222:6-7. Howell presents no evidence that Defendants did see the Tumblr post, but disputes any assertion that they did not know of his criticisms, because he had expressed them publically during faculty meetings, in-person conversations, and on Facebook. Pl.'s Stat. of Facts ¶ 56.

The Department assigned Howell to teach several large sections of general education classes, teaching over 400 students in the Fall 2016 semester and over 500 students in the Spring 2017 semester. Howell Decl. ¶ 22. Although the Defendants argue that faculty often have to teach general education classes with which they have little experience, Howell contends that no faculty member in the Department was assigned to teach over 500 students per semester like him, and describes his schedule as "punitive." Houlahan Decl. ¶ 14-16, 21, 22, 24-25, ECF No. 43-7; Howell Decl. ¶ 22, 23.

In May 2017, Dean Umble evaluated Howell as part of the standard procedure mandating evaluation of retrenchees every three years and decided to schedule an interim evaluation of Howell because she perceived a lack of recent sustained scholarship, professional activity, and service to the Department and University. Umble Decl. ¶ 1-2. Although Dean Umble states that interim evaluations lead to improvements and provide valuable feedback for faculty seeking promotion, Howell contends that they are often the first step in removing a tenured faculty member and impose a burden upon the faculty member under review. Umble Decl. ¶ 2, Howell Decl. ¶ 24.

### III.    STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law, and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248,

257 (1986). The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Fed. R. Civ. P. 56; *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am. Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied*, 507 U.S. 912 (1993).

## IV.   <u>ANALYSIS</u>

### A. ADEA

Howell brings age discrimination claims against Dean Umble, Chair Houlahan, and three other members of the Millersville University music faculty: Drs. Tacka, Banks, and Wiley. Howell contends that since the Department hired him in 2014, Defendants have denied his promotion application, effectively demoted him from his position of Director of Choral Activities, stripped him of his responsibilities to supervise student teachers, and subjected him to

heightened scrutiny, including two formal University investigations. Howell links these events to alleged ageist statements made by Chair Houlahan, Tacka, and Banks and a broader "pattern of ageism" in the Department, which allegedly encompasses mistreatment of other older faculty. For the reasons that follow, Howell cannot prevail on his claim as a matter of law, and Defendants' motion for summary judgment is granted with respect to the ADEA claim.

The Age Discrimination in Employment Act (ADEA) prohibits employers from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To succeed on an ADEA claim, a plaintiff must establish, by a preponderance of the evidence, that age was the "but-for" cause of the adverse employment action. *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 177–78 (2009). Age discrimination claims in which the plaintiff relies on circumstantial evidence proceed according to the three-part burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Keller v. Orix Credit All., Inc.,* 130 F.3d 1101, 1108 (3d Cir.1997) (reaffirming the application of a "slightly modified version of [*McDonnell Douglas*] in ADEA cases").

Under this three-part burden-shifting framework, the plaintiff must first produce evidence sufficient to convince a reasonable factfinder as to all of the elements of a prima facie case of discrimination. *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 465 (3d Cir. 2005). If a plaintiff establishes a prima facie case, "the burden of production (but not the burden of persuasion) shifts to the defendant, who must then offer evidence that is sufficient, if believed, to support a finding that the defendant had a legitimate, nondiscriminatory reason for the adverse employment decision." *Id.* (internal citations and quotations omitted). An employer need not prove, however, that the proffered reasons actually motivated the employment decision. *Id.* If a defendant

satisfies this burden, a plaintiff may then survive summary judgment by submitting evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Id.*

### 1. **Prima Facie Case:**

To establish a prima facie case of age discrimination, a plaintiff must demonstrate that (1) he is over forty, (2) is qualified for the position in question, (3) suffered from an adverse employment decision, and (4) this replacement was sufficiently younger to permit a reasonable inference of age discrimination. *Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 370 (3d Cir. 2004) (citing *Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 167 (3d Cir. 2001)).

Howell is over forty and therefore satisfies the first element. The parties dispute whether Howell can establish the second element, that he was qualified for the position in question. When Howell first applied, the Department found him unqualified for the position of Director of Choral Activities, but the University President overruled this determination and deemed Howell "minimally qualified." With respect to the full professorship Howell applied for, the Department found him unqualified under the exceptions clause of the promotion standards, but Howell disputes that the exceptions clause applies and contends he is qualified for the promotion.[3] However, case law requires that a court consider a plaintiff's "objective job qualifications," and should leave "the question of whether an employee possesses a subjective quality, such as leadership or management skill ... to the later stage of the *McDonnell Douglas* analysis." *DiFrancesco v. A-G Adm'rs, Inc.*, No. CIV.A. 13-4284, 2014 WL 4379114, at *7 (E.D. Pa. Sept.

---

[3] Defendants point out, correctly, that Howell seems to contend now that he would qualify for promotion even under the "exceptional" standard, even though he stated the opposite in his deposition. *See* Howell Dep. 105:19-107:5.

4, 2014), *aff'd*, 625 F. App'x 95 (3d Cir. 2015). "When a defendant's argument regarding a plaintiff's qualifications is intertwined with its assertion of a legitimate reason for the employment action, courts should be careful not to collapse the entire *McDonnell Douglas* analysis in [the] first step." *Id.* (citing *Cellucci v. RBS Citizens, N.A.,* 987 F. Supp. 2d 578, 590 (E.D. Pa. 2013); *Dorsey v. Pittsburgh Assocs.,* 90 F. App'x 636, 639 (3d Cir. 2004)) (internal quotations omitted). Therefore, because the University found Howell minimally qualified for his position, the Court finds that Howell can establish the second element of the prima facie case.

Howell can establish the third element, namely, that he suffered an adverse employment action. To satisfy the third element of the prima facie case, an employee must allege an adverse employment action sufficiently severe to have altered the employee's "compensation, terms, conditions, or privileges of employment, or to have deprived or tended to deprive him of employment opportunities or otherwise adversely affected his status as an employee." *Mayk v. Reading Eagle Co.*, No. CIV.A. 08-4866, 2010 WL 1141266, at *5 (E.D. Pa. Mar. 24, 2010) (citing *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1296–1297 (3d Cir. 1997), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)); *see also Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir.2001) (explaining that an "adverse employment action" is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment"). The plaintiff does not have to show economic or tangible discrimination, but at the same time, not every "insult, slight, or unpleasantness" gives rise to a valid claim. *Id.* "Reassignment with significantly different responsibilities," "failure to promote," "a less distinguished title," "a material loss of benefits," and "significantly diminished material responsibilities" can all satisfy the adverse event element.

*Id.* (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)) (holding that an

employment action is not materially adverse if it merely bruises the ego, results in a demotion

without change of pay, benefits, duties, or prestige, or leads to a merely inconvenient

reassignment). Howell contends that he suffered three adverse employment actions: (1)

Defendants rejected his promotion application; (2) Defendants demoted him from Director of

Choral Activities, leaving him with "significantly diminished material responsibilities," *see id.*;

and (3) Defendants subjected him to an Article 42/43 investigation that led to the removal of his

student teacher supervising responsibilities.[4] Pl.'s Opp. Mot. Summ. Judg. at 22. These

allegations satisfy the third element of the prima facie case.

With respect to the fourth element, Howell was not replaced by someone younger: the

University did not promote someone else instead of him, and Gremmell, who holds the position

interim Director of Choral Activities with the duties Howell argues belong to him, is the same

age as Howell. Where the plaintiff is not directly replaced, the fourth element is satisfied if the

plaintiff can provide facts which "if otherwise unexplained, are more likely than not based on the

consideration of impermissible factors." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808

---

[4] The first Article 42/43 investigation, which resulted in the loss of Howell's student
teacher supervision responsibilities, can support a prima facie discrimination claim because it
materially altered his duties. However, the Court finds that Howell errs in listing the second
Article 42/43 investigation, begun in February 2016 and related to complaints of student
harassment in class, as an adverse employment action. An investigation does not qualify as an
adverse employment action when it does not result in discipline or reduced responsibilities. *See
Rosati v. Colello*, 94 F. Supp. 3d 704, 714 (E.D. Pa. 2015), *appeal dismissed* (Dec. 10, 2015)
("Investigations, separate from any negative consequences that may result from them, do not
generally constitute adverse employment actions."); *Alers v. City of Philadelphia*, 919 F. Supp.
2d 528 (E.D. Pa. 2013) (finding that initiation of work rule violation investigations against
detective did not constitute adverse action under Title VII where detective never suffered any
actual discipline or penalty for incidents). The second investigation has not yet concluded.
Howell argues that the second investigation results from a "heightened scrutiny" of his job
performance that suggests an adverse action; however, this second investigation did not result
from Department scrutiny, but from complaints by Howell's students.

F.3d 638, 644 (3d Cir. 2015) (citing *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999)). Or, put differently, a "showing that the circumstances of the adverse employment action give rise to an inference of age discrimination" can satisfy the fourth element of the prima facie case. *Mayk v. Reading Eagle Co.*, No. CIV.A. 08-4866, 2010 WL 1141266, at *5 (E.D. Pa. Mar. 24, 2010). Howell can make this initial showing: he has produced evidence that although the University hired him as the Director of Choral Activities, he does not have all the responsibilities of the position. Chair Houlahan's statement that the Department did not have a Director of Choral Activities for recruitment purposes, combined with Tacka's past statements about the desirability of a young Director for recruitment purposes, permits at least a preliminary inference of age discrimination. Accordingly, Howell has established a prima facie case under the ADEA.

## 2. Defendants' Legitimate Reasons for Employment Actions

Given that Howell can establish a prima facie case of age discrimination under the ADEA, the burden of production passes to the Defendants to demonstrate legitimate non-discriminatory reasons for each of the alleged adverse actions.

Defendants state that they denied Howell's application for promotion because his lack of demonstrated qualifications. They point out that the Department committee, Chair Houlahan, and the University-wide committee all independently concluded that Howell did not meet the requirements under the "exceptional" clause for promotion. The Department committee found that he did not have the requisite student evaluations or adequate documentation of scholarship and service. They observed that Howell had a number of professional activities as a soloist, conductor, and clinician, but that only four had occurred in the previous seven years. Defs.' Ex. 22, ECF No. 42-2. The committee found that Howell's application included no documentation or evidence of recent activity, which the University Governance Manual required in application

materials, and concluded that Howell's application materials did not demonstrate his "continuous growth and involvement," as the promotion standards required. *Id.* Also, Howell's application included student evaluations from only four courses instead of the required five. *Id.* Chair Houlahan's evaluation included many positive assessments of Howell, but concluded that his sparse application made it "unclear" whether he surpassed the level of expectation in two out of the three assessment areas as required for promotion under the "exceptional" standard. Defs.' Ex. 23, ECF No. 44-2.

Defendants state that they find Howell equally unqualified to hold the title of Director of Choral Activities and to direct the upper-level choral groups. The Department initially found Howell unqualified for the position of Director of Choral Activities because of concerns about his degree: Howell has a D.M.A. in music education with a secondary concentration in choral conducting, not a Ph.D. in choral conducting. The faculty found their concerns justified after receiving various complaints and observing Howell's Glee Club performances. In an email to Dean Umble and DeSantis concerning the May 9, 2016 faculty meeting, during which Howell claims he became aware of his "demotion," Chair Houlahan describes the faculty's low opinion of Howell's skills and Howell's unwillingness to accept advice:

> We have not addressed the question if Dr. Howell is the Director of Choral Activities? Faculty have recommended that he not be hired for this position. Conducting an ensemble as opposed to directing a choral program are two very responsibilities [sic]. It is the professional opinion of the department that he simply does not have the skills to direct the Choral program or the Glee Club ensemble. My advisement notes document that I have followed the Dean's instructions and have repeatedly tried to offer specific advice and professional assistance to Dr. Howell regarding his assignments within the department….All of my advice has been ignored.

Defs.' Ex. 71, ECF No. 45-1. The notes from the faculty meeting with DeSantis and Dean Umble summarize Howell's colleagues' opinions that the Glee Club was a "sloppy performing

ensemble," that "[i]t's an embarrassment when he performs because he is not a conductor," and that "[t]here's a difference between entertainment and education." Pl.'s Ex. 66, ECF No. 57-6. Because the Department did not feel confident in Howell's ability to conduct high-level ensembles and teach upper-level classes, they assigned him large general-education classes.[5] Also, the Department traditionally focuses on the Kodály method, a specific pedagogical method of music instruction, and provides its students the opportunity to obtain certification in the Kodály method. Howell, however, does not have his Kodály certification, which further limits his ability to teach upper-level classes. Houlahan Decl. ¶ 8.

Defendants contend that the University had a legitimate reason for instituting the first Article 42/43 investigation against Howell and removing his responsibilities to supervise student music teachers. The Department relieved Howell's responsibilities to supervise student music teachers because he refused to comply with the requirements to provide the students adequate feedback, which resulted in a host school ending its relationship with Millersville University's student teachers. In an email to Chair Houlahan, the teacher at the host school shared her frustration at Howell's refusal to share his written feedback for a student teacher so she could compare it with her own, and stated, "[t]his is my third student teacher from Millersville and it will most likely be my last….I find the lack of communication and answers I did receive from Howell unprofessional and not what I would expect from Millersville." Defs.' Ex. 33, ECF No. 44-3.

Accordingly, the Defendants have carried their burden of production to demonstrate legitimate nondiscriminatory reasons for the actions upon which Howell bases his claims.

---

[5] The record offers reason to doubt that Howell considers teaching large classes an adverse employment action. In his promotion application materials, Howell wrote that "at no time have I had a more amazing opportunity to learn to engage students in relevant learning than in my large general education classes here at Millersville University." Defs.' Ex. 22, ECF No. 44-2.

### 3. Plaintiff's Evidence of Pretext and Causation:

Because Defendants have produced evidence of legitimate, non-discriminatory reasons for each of their challenged actions, the burden of production shifts back to Howell to provide evidence from which a jury could reasonably infer that Defendants' proffered reasons are pretexts for discrimination. *Burton v. Teleflex Inc.*, 707 F.3d 417, 426–27 (3d Cir. 2013). Howell may not simply show that his age was a factor motivating Defendants' decisions; instead, he must produce evidence supporting an inference that his age had a "determinative influence" on the decision. *Palmer v. Britton Indus., Inc.*, 662 F. App'x 147, 150 (3d Cir. 2016) (citing *Gross v. FBL Financial Svcs., Inc.*, 557 U.S. 167, 176 (2009)). He "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a ... determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

### a. Howell cannot point to any evidence from which a jury could reasonably disbelieve Defendants' stated reasons for the challenged decisions.

The Third Circuit Court of Appeals has stated that a plaintiff may not rebut an employer's stated reason merely by demonstrating that it was wrong, but must instead demonstrate that it was so wrong as to be unbelievable:

> To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find

them 'unworthy of credence,' and thus infer that the employer did not act for the stated reasons.

*Palmer v. Britton Indus., Inc.*, 662 F. App'x 147, 152 (3d Cir. 2016) (affirming grant of summary judgment where plaintiff failed to create dispute of material fact that adverse action would not have occurred but-for discrimination) (internal quotations omitted). Or more simply, a plaintiff "must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997). Howell falls far short of this standard.

Howell contends that he "should have been promoted to full professor like he had been at Edinboro, even under the exceptional standard, based on his performance in teaching, scholarship, and service." Pl.'s Opp. to Mot. Summ. Judg. at 28. All Howell's evidence concerning the denial of his promotion application presents variations on the same theme: that Defendants and the University made the wrong decision. Even if he is correct, though, merely demonstrating that an employer made an incorrect or imprudent decision does not establish pretext.

First, he contends that "[t]he University made it nearly impossible for [him] to be promoted" by evaluating his application under the "early promotion" procedures that required him not just to meet but to exceed expectations in at least two of the three areas of evaluation. *Id.* at 26. Howell argues that the University should not have evaluated his application under the stricter early promotion standard because of his status as a retrenchee from another university. *Id.* But Howell offers no evidence other than his own opinion that his retrenchee status meant that the Department committee, Chair Houlahan, the University-wide committee, and Provost Prabhu should not have applied the "early promotion" standard to his application.

Next, Howell points to evidence of "procedural irregularities" in the review of his application. *Id.* He points to "tremendous confusion" among the Department committee concerning what standard to use in reviewing his application and whether to consider his past work at Edinboro. *Id.* Howell cannot show pretext merely by showing that the Department applied the wrong standard out of confusion. Instead, he must prove that they deliberately applied the wrong standard because of his age. He has failed to do so. Howell complains that Tacka, whom Howell considers biased against him, served on the Department committee, but he presents no evidence that Tacka's alleged bias influenced the committee's decision, especially given that the committee voted unanimously. Howell also alleges that the committee "pretextually discounted" his positive performances because his application did not include programs or other evidence to substantiate his listed performances, did not contain hard copies of his published articles, and contained outside evaluations came from assistant professors. *Id.* at 27. However, he does not dispute that his application did in fact suffer from these defects, nor does he offer any evidence that the committee's denial of his application because of these defects violated any promotion procedure.

Howell also complains that Chair Houlahan provided feedback on the Department committee's draft evaluation, and sent a draft of his own negative evaluation to a friend outside of the University, which Howell argues violated "procedural norms" and confidentiality. *Id.* at 28. But he offers no evidence that Chair Houlahan improperly influenced the Department committee's decision or that sending his evaluation to a friend violated any University procedure beyond a generalized "confidentiality." He further argues that Dean Umble relied on "pretextual" reasons for denying his application when she cited the absence of certain materials from Howell's application, which Chair Houlahan's evaluation referenced. *Id.* This argument

misunderstands Dean Umble's evaluation. Under the University's Promotion Statement, the applicant submits ten copies of the bound application packet and one copy of supporting materials. Pl.'s Ex. 18, III.C, ECF No. 57-4. The Department chair keeps the supporting materials and distributes the applications to the Department committee and the Dean. *Id.*; Umble Dep. 226-227. Dean Umble testified that when she evaluates a promotion candidate, she reviews the applications but does not seek out the supporting materials. Umble Decl. ¶ 3. She stated that Howell's application referenced peer teaching observations and student evaluations in his supporting materials, but did not contain them. *Id.* Howell does not dispute this.

Howell traces his scholarly and service-oriented achievements and discusses his achievements at Edinboro University, which he believes the reviewers should have considered; however, he puts forward no evidence that the review procedures required them to do so. Howell also undermines his own argument that Defendants unfairly devalued his performance: he admits that Chair Houlahan found that "Howell is to be commended for his teaching, scholarly growth, as well as his service to Millersville University," but argues that Chair Houlahan "relied on the misplaced 'exceptional' standard to recommend against promotion." Pl.'s Opp. to Mot. Summ. Judg. at 28.

To recapitulate, Howell can prove, at best, that Defendants applied the wrong standard in evaluating his application for promotion. He cannot prove that they deliberately misapplied the standard because of his age. However much he may disagree with the decision and emphasize his own qualifications, he has not produced evidence of such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendants' rationale for denying his promotion that a reasonable factfinder could rationally find it "unworthy of credence."

Howell also tries to demonstrate pretext with respect to the second adverse employment action, his "demotion" from the position of Director of Choral Activities. He argues that the decision was a pretext for age discrimination because Chair Houlahan's decision to strip the title and duties from Howell clearly conflicts with Howell's appointment letter and "directly impact[s] the terms and conditions of Dr. Howell's employment." *Id.* at 29-30. Additionally, Howell points to Chair Houlahan's renaming the position "Coordinator of Choral Activities" as pretext, given that no other PASSHE university uses the title and the Coordinator position had the same duties as the Director, including conducting the top choirs. *Id.* at 30.

Howell can quibble about the exact name of the position, but none of his arguments casts doubt upon the Department's conclusion that Howell does not possess the qualifications for Director of Choral Activities, much less makes it "unworthy of credence."

Howell contends that the Department's concern about his lack of a doctorate in Choral Conducting is pretextual, because the job description for Director of Choral Activities listed a doctorate in choral conducted as "preferred," not "required." Howell bases his argument on a misreading. The posting describes the "Required" qualification as "ABD—Doctorate program leading to Doctorate in Choral Conducting," meaning that, at a minimum, an applicant for Director of Choral Activities must have completed all but the dissertation requirement (ABD) of a Doctorate in Choral Conducting program. Pl.'s Ex. 98, ECF No. 57-7; Defs.' Stat. Facts. ¶ 2. The posting lists the "Preferred" qualification as "Doctoral Degree in Choral Conducting." Pl.'s Ex. 98, ECF No. 57-7. Thus the distinction between required and preferred qualifications hinges, not on whether the applicant has a primary degree focus in choral conducting or in another subject, as Howell contends, but on whether the applicant has yet to finish the dissertation requirement of a Doctorate in Choral Conducting program or whether he has completed the

degree. The Department therefore had adequate basis to conclude that Howell did not have the required qualifications to fulfill all the duties of Director of Choral Activities, given his lack of a Doctorate in Choral Conducting.

Howell's evidence concerning the Coordinator of Choral Activities position underscores the Department's lack of confidence in his ability to conduct the top choirs: Howell references Tacka's statement that the Department hired Gemmell as a "temporary solution…to cover the major responsibilities that would be covered by the coordinator of the choral activities." *Id.* Furthermore, as stated earlier, Gemmell, the replacement adjunct who had many of the responsibilities of the Director of Choral Activities, is the same age as Howell, weakening any inference that age-related discrimination motivated Howell's "demotion."

Howell also attempts to put forward evidence for disbelieving Defendants' reasons for the first Article 42/43 investigation and the removal of his student teacher supervision duties. He states that when Chair Houlahan received the student complaint alleging a lack of feedback, he immediately forwarded it to Dean Umble and Human Resources instead of trying to resolve the matter informally at the Department level as Department and University protocol required. *Id.* Howell points out that the Article 42 investigation did not find any wrongdoing, but that the University failed to disclose to Howell that he had been cleared. *Id.* Howell's argument overlooks the fact that his deficient supervision led to at least one student teacher complaint and the loss of a host school. The Department reasonably could decide to restrict his duties out of concern for future reputational damage and loss of much-needed host schools for student teachers. Given this fact, he cannot claim that the Department's concern about his ability to give proper supervision to student teachers was so implausible as to be pretextual for age discrimination.

Howell cannot point to any evidence, direct or circumstantial, from which a jury could reasonably disbelieve Defendants' articulated legitimate reasons for their challenged actions.

**b. Howell has offered no evidence from which a reasonable jury could believe that an invidious discriminatory motive was more likely than not a determinative cause of Defendants' actions.**

A plaintiff seeking to establish pretext by producing evidence sufficient to allow a reasonable jury to believe that an invidious discriminatory reason was more likely than not a "determinative cause of the employer's action" must point to evidence demonstrating any of the following satisfies this second way to prove pretext: (1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably. *Fuentes*, 32 F.3d at 764; *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644–45 (3d Cir. 2015) (citing *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998)). If the plaintiff satisfies this step, at trial he must convince the factfinder that not only was the employer's proffered reason false, but the real reason was impermissible discrimination. *Id.*

Howell offers evidence of past statements by Defendants in an attempt to show past discrimination against older faculty. First, he points to three statements by Tacka about the desirability of a "young and energetic" or "young and charismatic" Director of Choral Activities. However, courts give little weight to stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process, particularly when the remarks are temporally remote from the challenged decision. *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 545 (3d Cir. 1992). Similarly, Tacka's remarks deserve little weight here. First, he is not a decisionmaker

with respect to the challenged actions. Although he chaired the Department committee that reviewed Howell's promotion application, the committee included four other faculty members and voted unanimously. Additionally, independent review by Chair Houlahan and the University committee confirmed the Department committee's decision. *See Connolly v. Pepsi Bottling Grp., L.L.C.*, No. CIV.A. 06-1462, 2008 WL 4412090, at *14 (W.D. Pa. Sept. 22, 2008), *aff'd sub nom. Connolly v. Pepsi Bottling Grp., LLC*, 347 F. App'x 757 (3d Cir. 2009) (holding that stray remarks did not support inference of discrimination where they were made several months prior to plaintiff's termination, did not relate to the stated reasons for the termination, and no evidence existed that any of the three other members of the decisionmaking group were aware of or participated in that conduct).

Howell provides no evidence that Tacka had any influence over the decision to "demote" Howell or to conduct the Article 42/43 investigation and relieve Howell of his student teacher supervision responsibilities. Most fatally to an inference of age discrimination, Tacka accepted correction by other Defendants. Banks and Wiley corrected Tacka at the faculty meeting, stating that it wasn't about the person being young, but rather the person's qualifications, which could include charisma and energy, and Tacka immediately accepted the correction and clarified that he meant to say charismatic. Howell admits that Chair Houlahan corrected Tacka the subsequent two times that he used the word "young." These isolated—and subsequently clarified—comments cannot defeat summary judgment with respect to Tacka. Moreover, Banks's, Wiley's, and Chair Houlahan's refutations of Tacka's remarks weakens any inference that age discrimination motivated their actions.

Howell presents several other statements allegedly related to age: negative comments by Banks concerning Dr. Toney's age at the time the Department was considering him and her

desire to avoid hiring another retrenchee after he left, and Chair Houlahan's remark about an older candidate that "I am afraid that if we brought her on board, she would be walking around here with an oxygen tank." Pl.'s Opp. to Mot. Dismiss at 22. Howell points only to Dr. Darmiento's declaration to substantiate these statements and offers no explanation of their context.[6] Howell suggests also that Chair Houlahan expressed a desire for an "energetic" candidate, and concludes that "energetic" "is code for 'younger.'" Pl.'s Opp. to Mot. Summ. Judg. at 22. However, he presents no support for this conclusion. Even taken together, and assuming that these comments support an inference of age-related bias on behalf of Defendants, they do not suggest that Defendants' stated reasons for the actions Howell complains about—his lack of qualifications and failure to perform his job duties properly—are pretexts for age discrimination. *See Cellucci v. RBS Citizens, N.A.*, 987 F. Supp. 2d 578, 592 (E.D. Pa. 2013) (holding that "handful of remarks" about age and retirement plans lacked probative force necessary for reasonable jury to conclude that termination was because of age).

Howell presents the testimony of Dr. Toney and Dr. Darmiento to show an "ageist atmosphere in the Department" and show that similarly situated older faculty members have been mistreated. Toney's and Darmiento's declarations suggest a generally negative atmosphere in the Department, but do not necessarily link their poor treatment to their age. Howell seems to admit that the negative "culture" affects everyone, not just him or older faculty: "I have also been noticing how the culture of this department affects people—current and former faculty members, current and former students, potential students, students who were formerly music majors, and so forth." Defs.' Ex. 62, ECF No. 44-7. Although, if true, Howell's observations

---

[6]     In their Reply brief, Defendants seem to suggest that Chair Houlahan's "oxygen tank" comment alluded to the applicant's weight, not to her age. Defs.' Reply, ECF No. 59, at 10.

reflect a sad state of discord in the Department, they undermine his claims that age discrimination motivated the negative treatment he suffered.

Neither Toney nor Darmiento was denied a promotion. The only adverse action they suffered in common with Howell was removal from conductor positions.[7] Toney asserts he was removed as the Wind Ensemble conductor, even though as Director of Bands he should have conducted the top wind ensemble. Toney Decl. ¶¶ 12-13. Wiley, who is 64, currently directs the Wind Ensemble. Wiley Dep. 7:15-16; Tacka Dep. 159:19-20. Darmiento was removed as the director of the Millersville University Chamber Ensemble mid-year and replaced by a younger director. Darmiento Decl. ¶ 6. Unlike Drs. Toney and Darmiento, Howell was not removed from conducting top ensembles mid-season; rather, he never conducted them at all because the Department found him unqualified. Howell has not refuted the Department's conclusion that he did not possess the qualifications necessary to conduct the top choirs. Although Darmiento was replaced by a younger director, Toney was not.[8] A single incident of alleged replacement of an older conductor by a younger one hardly establishes a pattern of discrimination by the Department sufficient to carry Howell's burden. Most importantly, Howell cannot prove that age discrimination motivated his demotion, because the Department gave his duties to Gemmell, who is the same age as Howell.

Considering the evidence in the light most favorable to him, Howell has failed to carry his burden of producing evidence sufficient to allow a jury to conclude that Defendants' stated

---

[7] Dr. Darmiento states that she was "targeted with a special investigation" in April 2010, but that the charges were "absurd" and "trumped up to frighten me," in contrast to the well-grounded investigations into Howell's professionalism. Darmiento Decl. ¶ 22.

[8] Scott Meunz, who is in his late 20s or early 30s and had been the assistant director of the marching band, took over Dr. Toney's post as director of the marching band, not the Wind Ensemble conductor duties at issue. Houlahan Dep. 148:18-149:4; 151:4-6; Umble Dep. 161:22-162:3.

reasons for their actions were in fact pretexts for age-related discrimination. Therefore, Howell's ADEA claims fail as a matter of law and the Court grants Defendants' Motion for Summary Judgment with respect to Count I.

## B. HOSTILE WORK ENVIRONMENT

To prevail on a hostile work environment claim under the ADEA, a plaintiff must show: (1) he suffered intentional discrimination because of his age; (2) the harassment was severe or pervasive; (3) the harassment detrimentally affected him; (4) the harassment would detrimentally affect a reasonable person in that position; and (5) respondeat superior liability. *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006) (setting forth elements of hostile work environment claim under Title VII); *Glanzman v. Metro. Mgmt. Corp.*, 290 F. Supp. 2d 571, 581 (E.D. Pa. 2003) (applying elements to ADEA hostile work environment claim). The alleged harassment "must be so severe or pervasive that it alters the conditions of the [plaintiff's] employment and creates an abusive environment." *Weston v. Pa.*, 251 F.3d 420, 426 (3d Cir. 2001). Stray remarks made by non-decisionmakers that are discriminatory generally are considered insufficient to support an inference of discrimination. *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992).

Howell's claim fails because he cannot prove that he suffered intentional discrimination because of his age or that any discrimination was severe and pervasive. As discussed above, he has not produced evidence other than a handful of isolated statements by Defendants and the conjecture of Drs. Toney and Darmiento that any adverse treatment they suffered was because of their age to support a reasonable inference that the alleged treatment he suffered resulted from age discrimination. As explained above, this evidence does not suffice to prove that age discrimination motivated Howell's promotion denial, demotion, and removal of student teaching

supervision. Howell offers additional bases for his hostile work environment claim, such as

Chair Houlahan and Tacka's solicitation of negative reviews of Howell, their opposition to

Howell's new proposed course on love songs, and Chair Houlahan's disparagement of the Glee

Club; however, every single one of these acts is neutral with respect to his age. *See Jaworski v.*

*New Jersey Tpk. Auth.*, No. CIV 05-4485, 2008 WL 4139375, at *8–9 (D.N.J. July 25, 2008)

(granting summary judgment to defendants where plaintiff only identified one age-based

comment in the record and all other alleged harassment was age-neutral); *Koschoff v. Henderson*,

109 F. Supp. 2d 332, 346 (E.D. Pa. 2000) (holding that mistreatment and disrespect unmotivated

by the plaintiff's statutorily-protected trait does not create a hostile work environment).

 Additionally, to support a hostile work environment claim, conduct must be severe and

pervasive. To determine whether comments were severe or pervasive, courts evaluate "the

frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating or a mere offensive utterance; and whether it unreasonably interferes with the

employee's work performance." *Whitesell v. Dobson Commc'n*, 353 F. App'x 715, 717 (3d Cir.

2009) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)). Importantly, the

ADEA does not endorse a "cause of action for mere unpleasantness" in the workplace. *Hartsell*

*v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997). Conduct motivated by a bad working

relationship is not discrimination. *Koschoff v. Henderson*, 109 F. Supp. 2d 332, 346 (E.D. Pa.

2000), *aff'd sub nom. Koschoff v. Runyon*, 35 F. App'x 357 (3d Cir. 2002). At best, Howell

alleges only unpleasantness in the Department.[9] None of his allegations involve physically

---

[9]  The record shows that Howell has contributed more than a few sour notes of his own to
the lack of harmony in the Department. The notes from the faculty meeting with DeSantis and
Dean Umble reveal that "[f]aculty feel threatened and for [sic] their health and wellness and
safety" because of Howell's hostility and his confrontational manner at faculty meetings. Pl.'s

threatening or humiliating conduct. *See Logan v. Countrywide Home Loans*, No. CIV.A. 04-5974, 2007 WL 879010, at *12 (E.D. Pa. Mar. 15, 2007) (holding that age-related comments did not support hostile work environment claim where they were not threatening or profane and primarily occurred in private phone conversations). He provides no evidence that the alleged hostile environment unreasonably interfered with his work performance. *Compare Johnson v. Philadelphia Hous. Auth.*, 218 F. Supp. 3d 424, 438 (E.D. Pa. 2016) (denying summary judgment where plaintiff was target of ongoing race- and age-related slurs, received less desirable assignments and equipment, and plaintiff alleged that harassment interfered with work by interrupting him or undermining him). And most importantly, he does not present any evidence that he personally was the target of any age-related insults or harassment. The actions of which Howell complains do not rise to the level of "abusive," and the Defendants are entitled to summary judgment on his hostile work environment claim.

---

Ex. 66. In an email to DeSantis and Dean Umble, Chair Houlahan observed that such behavior typified Howell's interactions with his colleagues:

> In light of the current stress on the department, it is unfortunate that during our workshop yesterday Dr. Howell's interactions with several faculty members demonstrated a total lack of respect and a sense of civility. Dr. Howell made personal attacks on individual faculty, the chair and the Provost. His interactions went beyond the normal discourse that one expects at faculty meetings and rapidly descended into allegations and obtuse innuendoes. He repeatedly talked over faculty and was unwilling to listen to alternative opinions. (This lack of collegiality has now become a typical communication pattern adopted by Dr. Howell).

Defs.' Ex. 71.

### C. AIDING AND ABETTING CLAIMS UNDER PHRA

Because Howell's claims for age discrimination and hostile work environment fail, his claims for aiding and abetting that discrimination and hostile work environment necessarily fail as well. This Court grants summary judgment to Defendants on Counts IV and V.

### D.     FIRST AMENDMENT

Howell brings claims against all Defendants in their individual capacities for retaliation for his exercise of his free speech rights under the First Amendment. Howell contends that he engaged in various forms of protected speech, which fit into four broad categories:

1. **Internal Criticisms of Music Department Governance**

2. **Social Media Posts**

3. **Howell's Decisions Allegedly Made Pursuant to Academic Freedom**

4. **Howell's 2016 Grievance Alleging Age Discrimination and Mistreatment**

Howell asserts that he suffered various forms of retaliation as a result of his free speech, including denial of his promotion application, the two Article 42/43 investigations, a punitively heavy schedule during the 2016-2017 academic year, an interim evaluation for the 2017-2018 academic year, Department questioning of his academic credentials, limited performance opportunities, and a general pattern of antagonism. As discussed below, Howell cannot establish that the First Amendment protects the first three categories of speech, and cannot establish a causal link between any of the four categories and the alleged retaliation. Furthermore, Defendants can prove that all of the alleged retaliatory actions would have occurred even if Howell had not engaged in speech. Therefore, his claims fail as a matter of law and this Court grants Defendants' Motion for Summary Judgment.

At the outset, this Court emphasizes the long-standing recognition of the particular importance of First Amendment protection of free speech in the university setting. As the Supreme Court stated sixty years ago in *Sweezy v. State of New Hampshire*:

> The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation.

354 U.S. 234, 250 (1957).

To state a First Amendment retaliation claim, a public employee must demonstrate (1) that the First Amendment protects his activity, and (2) that the protected activity was a substantial factor in the alleged retaliatory action. *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009) "The first factor is a question of law; the second factor is a question of fact." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006). If the plaintiff satisfies these two elements, the burden shifts to the defendants to demonstrate that the same action would occur if the speech had not occurred. *See Green v. Phila. Hous. Auth.*, 105 F.3d 882, 885 (3d Cir. 1997).

With respect to the first element, the First Amendment protects a public employee's statement when, "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." *Hill*, 455 F.3d at 241 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). Courts must determine whether an employee's speech addresses a matter of public concern by the "content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). The Third Circuit Court of Appeals has stated that speech on a matter of public concern "generally addresses a social or

political concern of the community" or "relate[s] to broad social or policy issues." *Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 169–70 (3d Cir. 2008). In other words, "the content of these types of speech goes to the core of the First Amendment because it adds to the debate on matters of public importance." *Id.*

By contrast, speech expressing a personal grievance limited to the "day-to-day minutiae" of employment does not address a matter of public concern and does not benefit from First Amendment protection. *De Ritis v. McGarrigle*, 861 F.3d 444, 455 (3d Cir. 2017). Even if it "brush[es] … against a matter of public concern" by virtue of the employee's public employment, speech that addresses only the employee's own problems expresses only a "personal grievance" and does not receive First Amendment protection. *Miller v. Clinton Cty.*, 544 F.3d 542, 551 (3d Cir. 2008).

1. **Howell's speech does not fall within the protection of the First Amendment.**

   a. **Criticisms of Music Department Governance**

Howell's criticisms of the Department's leadership and environment through internal emails and at faculty meetings do not address a matter of public concern, and therefore receive no First Amendment protection. Howell claims retaliation for his criticisms of Department management, his insistence that he was the Director of Choral Activities, his refusal to collect accreditation information when he claimed other Department members were better positioned to do so. Howell references two emails which illustrate well the personal nature of Howell's claims. In a June 11, 2015 email to the entire Department and Dean Umble, Howell states that he will not require his students to purchase Department lecture notes and expresses his "lack of confidence in the current leadership model that seems heavy handed and not inclusive of

everyone's input." Pl.'s Ex. 8. In his November 14, 2015 email to Chair Houlahan, Howell summarizes a number of complaints surrounding Chair Houlahan's alleged solicitation of negative feedback to create controversy and "overall heavy-handedness in the way the department is run," and expresses concerns about the effects on student and faculty retention. Pl.'s Ex. 5, ECF No. 57-4. He accuses Chair Houlihan and other faculty of working to document problems with Howell's teaching, and invites his colleagues to attend his rehearsals, concerts, and classes to encourage him and improve his teaching. *Id.* Howell concludes, "I encourage you to work directly to support the excellent faculty in your department and to encourage other music faculty members to do the same …. I expect to remain in this department for many more years and I wish to work directly with you and other faculty members to foster an encouraging and positive environment." *Id.*

Howell contends that his First Amendment claims "primarily are linked to Howell's criticism regarding Department governance, forcing students to purchase Department lecture notes (that do not cost money to generate) and certain concert tickets, and the mistreatment of himself and other faculty members in the Department," and argues that "conduct regarding the rights of students and other faculty members is of public concern and protected by the First Amendment." Pl.'s Opp. Summ. Judg. at 44.

Howell construes "public concern" too broadly. Reviewing the cases where courts have found that speech implicates a matter of public concern reveals that Howell's claims sound in quite a different key. In *Pickering v. Board of Education*, the seminal case governing retaliation claims by public employees, the Supreme Court held that a public school teacher's letter to a local newspaper complaining about the allocation of school funds involved a matter of public concern. 391 U.S. 563, 572-73 (1968). The Supreme Court revisited the issue of public employee

speech rights in *Connick v. Myers*, in which a New Orleans Assistant District Attorney was fired for circulating a questionnaire to other employees regarding an employee transfer policy. 461 U.S. 138, 140 (1983). Recognizing that "government offices could not function if every employment decision became a constitutional matter," the Court stated: "Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government; this does not require a grant of immunity for employee grievances not afforded by the First Amendment." *Id.* at 147. The Court held that most of the survey questions were not protected speech because they involved a personal grievance rather than a matter of public concern, but that one question, which inquired whether the assistant district attorneys ever felt pressured to contribute to political campaigns, did touch upon a matter of public concern. *Id.* at 148.

Following *Pickering*, the Court has found the following statements to be matters of public concern: following an assassination attempt on the President, an employee's remark "if they go for him again, I hope they get him," *Rankin v. McPherson*, 483 U.S. at 384–87 (1987); legislative testimony by a state college teacher advocating a college's elevation to four-year status, *Perry v. Sindermann*, 408 U.S. 593, 595 (1972); a memorandum concerning teacher dress codes a teacher gave to a radio station, *Mt. Healthy City School Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274 (1977); and complaints about school board policies and practices, *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 413 (1979).

The Third Circuit Court of Appeals has classified public employee criticism of office internal operations as a matter of public concern in limited circumstances. *See Zamboni v. Stamler*, 847 F.2d 73, 77 (3d Cir. 1988) (civil service employee's criticism of county prosecutor's reorganization and promotion plan that implicated whether prosecutor had

impermissibly circumvented civil service laws); *Rode v. Dellarciprete*, 845 F.2d 1195, 1201 (3d Cir. 1988) (state police civilian employee communication to reporter alleging speaker was harassed because of racial animus); *Czurlanis v. Albanese*, 721 F.2d 98, 104 (3d Cir. 1983) (county auto mechanic's allegation at public county board meeting that internal management of Department of Motor Vehicles wasted taxpayer money); *Trotman v. Board of Trustees of Lincoln University*, 635 F.2d 216, 225 (professor's criticism of university president's efforts to increase faculty/student ratio by retrenching faculty); *Monsanto v. Quinn*, 674 F.2d 990, 996–97 (3d Cir. 1982) (tax department employee's letters to tax commissioner expressing dissatisfaction with management of Tax Division that impaired the effectiveness of tax-collecting operations). These cases indicate that the First Amendment protects speech disclosing public officials' misfeasance, but not speech intended to air personal grievances. *Czurlanis*, 721 F.2d at 103.

To summarize, precedent suggests that speech touches a matter of public concern if it "relate[s] to broad social or policy issues," *Sanguigni v. Pittsburgh Bd. of Public Educ.,* 968 F.2d 393, 397 (citing *Rankin* and *Givhan*); "implicate[s] the discharge of public responsibilities by an important government office, agency, or institution," *id.* 397–98 (citing *Connick* and *Pickering*); "seeks to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials," *Holder v. City of Allentown,* 987 F.2d 188, 195 (3d Cir. 1993); or "relate[s] primarily to the way in which a government office [i]s serving the public." *Sanguigni,* 968 F.2d at 398 (citing *Czurlanis*). In short, the content of these types of speech goes to the core of the First Amendment because they add to the debate on matters of public importance.

Howell's complaints did not address such high-minded issues; instead, the content, form, and context of Howell's speech characterize it as a personal grievance. He complained primarily

about Department decisions to raise revenue for student activities and his treatment at the hands of his colleagues. He expressed these opinions at faculty meetings and in emails restricted to the Music Department and Dean Umble. *Compare Swineford v. Snyder Cty. Pa.*, 15 F.3d 1258, 1272 (3d Cir. 1994) (characterizing complaints to the commissioners, the press, and finally several investigatory agencies as having a "public mien" and thus touching matters of public concern and distinguishing complaints made only to fellow staff members). Such complaints about the "morale of the office" do not benefit from First Amendment protection. *See Connick,* 461 U.S. at 148 (holding that employee's questionnaire regarding office morale was not a matter of public concern because she was merely gathering "ammunition" against her supervisors); *Sanguigni,* 968 F.2d at 399 (holding that employee's statements regarding morale alone do not rise to the level of a matter of public concern). Nor do complaints based in self-interest, like Howell's insistence that he is the Director of Choral Activities and demands to conduct upper-level choirs, implicate matters of public concern. *See Swineford,* 15 F.3d at 1272 (citing *Connick,* 461 U.S. at 148) (observing that "self-interest and animus may indicate the speech involves a private dispute rather than an issue of public concern"). Additionally, Howell's refusal to collect accreditation data, a personal grievance about his duties, does not address any matter of public concern worthy of First Amendment protection.

Howell's complaints did not rise above the "day to day minutiae" of the Department, nor did he express them to a broad public audience, and as a result, he did not speak on a matter of public concern. *See Cooper v. Cape May Cty. Bd. of Soc. Servs.*, 175 F. Supp. 2d 732, 744 (D.N.J. 2001) (holding that plaintiff's complaints about difficulty working with defendant, her tone and demeanor towards him, her distribution of work to him, the authorization of leave, and his formal reprimand surrounding time cards and the postage machine was not speech touching

upon a matter of public interest). Howell clearly did not present his claims as a citizen, but as a member of the faculty. He spoke not about matters of public concern, but about his own work environment and the lack of harmony in the Music Department.  But the "First Amendment does not require a public office to be run as a roundtable for employees' complaints over internal office affairs." *Connick*, 461 U.S. at 149. Therefore, his criticisms of the Music Department do not fall under the protection of the First Amendment and cannot ground a claim for retaliation.

### b.  Social Media Posts

Howell claims that the Defendants retaliated against him for two social media posts: (1) his April 2017 Tumblr post summarizing his criticisms of Chair Houlahan, Tacka, and the Department, *see* Pl.'s Opp. to Mot. Summ. Judg. at 4; and (2) his February 2017 post in a Facebook group for his classes defending his teaching methods in light of student criticism.

No evidence suggests that any Defendants saw Howell's Tumblr post. Speech which the alleged retaliating party does not know about cannot support a retaliation claim. *See Ambrose v. Twp. of Robinson,* 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motivating factor in a decision, the decisionmakers must be aware of the protected conduct."). Because no Defendants saw the post, Howell cannot prove that it was a "substantial factor in the alleged retaliatory action," and his claim fails for lack of causation. *See Gorum*, 561 F.3d at 184.

Although Howell does not dispute that no Defendant saw his Tumblr post, the record contains evidence that at least one Defendant was aware of the post generally. Tacka stated in his deposition that students had told him that Howell had posted online about the Department and University, which upset him given that Howell could be affecting the reputation of the Department. Tacka Dep. 186-188. However, he stated that he had not read any specific posts. *Id.*

At best, then, Howell can prove only that Defendants knew of his post to the extent that they knew he was making criticisms of the Department generally. Howell produces no evidence that Defendants became aware of any additional criticisms through Tumblr that they did not hear through the other means discussed above. And, as discussed above, these criticisms did not involve a matter of public concern. Therefore, even if Howell could establish causation with respect to his Tumblr post, his retaliation claim fails because he did not speak on a matter of public concern. Howell cannot maintain his First Amendment claim based on his Tumblr post in April 2017.

Howell also claims that the First Amendment protects his Facebook post defending his broader pedagogical views. Teachers generally have the right to advocate outside the classroom for in-class use of certain curriculum materials or methods. *Edwards*, 156 F.3d at 491; *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1176 (3d Cir. 1990) (recognizing that a teacher's out-of-class conduct, including advocacy of particular teaching methods, is protected, but school had the right to dictate in-class pedagogical method). However, educational institutions can regulate a teacher's in-class speech. *See Pickering v. Board of Educ.,* 391 U.S. 563, 568 (1968) (holding that dismissal of a teacher for writing a letter to a newspaper criticizing the school violates First Amendment); *Clark v. Holmes,* 474 F.2d 928 (7th Cir.1972) (per curiam) (upholding firing of teacher whose biology classes contained too much discussion of sex). The context of Howell's speech matters here: he expressed his educational philosophy, not in a public blog, town hall meeting, or newspaper op-ed, but on a Facebook page he created for one of his classes—effectively, a digital extension of the classroom. Furthermore, he made the post in direct response to a student's comment in the previous class session, as evidenced by the fact that the

student responded to further explain himself. *See* Pl.'s Ex. 57. As a result, Howell's Facebook post is properly considered in-class speech and does not receive First Amendment protection.

### c. **"Academic Freedom" Claims**

Howell claims that Defendants have retaliated against him for his exercise of academic freedom. Specifically, Howell claims that academic freedom protects his refusal to require his general education students to buy the Department lecture notes and to provide written feedback to student teachers he supervised, as well as his defense of his teaching methods on Facebook. However, the concept of academic freedom in the First Amendment context does not extend as far as he suggests.

The First Amendment does not protect a teacher's in-class conduct because during class, the teacher acts as the educational institution's proxy, and the educational institution, not the individual teacher, has the final say in how to teach students. *See Brown v. Armenti*, 247 F.3d 69, 74–75 (3d Cir. 2001). The institution, not the teacher, has control over the "four essential freedoms" that comprise academic freedom: the right of an institution to choose "who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Edwards v. Cal. Univ. of Pa.,* 156 F.3d 488, 492 (3d Cir. 1998) (quoting *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 312 (1978)). Courts have made quite clear that a teacher has no right to act in contravention of his institution's in-class policies in the name of academic freedom.

Howell incorrectly asserts that the First Amendment allows him to dictate what may be taught and how it shall be taught, in violation of the Department's set policies. Although he may disagree with the requirement that general education students in the Department purchase the Department-created lecture notes to fund the concerts they must attend, that requirement expresses, ultimately, the University's determination of what should be taught in the general

education music curriculum. Additionally, the requirements for written feedback to student teachers reflect a decision as to how best to run a student teaching program, a pedagogical decision left to the educational institution. Although Howell may have other ideas about proper pedagogy, he must follow the policies his institution sets—the First Amendment does not protect his deviations from those policies. *See Brown v. Armenti*, 247 F.3d 69, 75 (3d Cir. 2001) (holding that a public university professor does not have a First Amendment right to expression via school's grade assignment procedures, because grading is pedagogic: the assignment of the grade is subsumed under the university's freedom to determine how a course is to be taught).

### d. 2016 Union Grievance

Howell claims that Defendants retaliated against him for the union grievance he filed on June 10, 2016. The First Amendment does not automatically protect grievances by union members. *See Thomas v. Delaware State Univ.*, 626 Fed. App'x. 384, 388 (3d Cir. 2015) ("While it is true that union activities may sometimes touch on a matter of public concern ... it is not the case that all union-related grievances do[.] [Plaintiff's] grievances related to 'working conditions and other issues in union members' employment' and [Plaintiff] offers nothing that would transform those personnel matters into issues of interest to the broader community."). Courts apply the same analysis discussed above to determine whether a union grievance merits First Amendment protection. *See Killion v. Coffey*, No. 13-1808 (RMB/KMW), 2016 WL 5417193, at *8 (D.N.J. Sept. 27, 2016), *aff'd*, No. 16-3909, 2017 WL 2628881 (3d Cir. June 19, 2017).

Howell's grievance repeats the same complaints analyzed above: it states that Howell had not been assigned the duties of Director of Choral Activities, contends that the Department solicited complaints about him and questioned his credentials, and summarizes the alleged

discriminatory comments by faculty members. Defs.' Ex. D12. As explained earlier, these allegations do not implicate a matter of public concern and therefore do not receive First Amendment protection. Therefore, Howell's grievance expressing these complaints does not receive protection either, and Howell's retaliation claim based on his grievance fails.

**2. Howell cannot prove that his protected activity was a substantial factor in Defendants' alleged retaliatory action and, even if he could, Defendants can prove that they would have taken the same actions even if Howell's speech had not occurred.**

Even if the First Amendment did apply to all the speech that Howell claims led to retaliation, his claims fail because he cannot establish that his speech was a substantial factor in the alleged retaliatory actions. And even if he could, Defendants can establish that the same alleged retaliatory actions would have occurred even if Howell's speech had not, which entitles them to summary judgment. Viewing the evidence in the light most favorable to Howell, the record contains ample justification for all the alleged retaliatory actions Howell complains about.

First, Howell depicts his promotion denial as retaliation for his speech. Howell cannot show that his speech motivated Defendants' denial of his promotion application because Howell made most of the speech in question after the University had denied his application. The University-wide committee informed Howell of its decision to deny his application on April 11, 2016, after the Department committee and Chair Houlahan had already made their decisions. *See* Defs.' Ex. 32. Howell insisted he was the Director of Choral Activities at the Department meeting in May 2016, filed his union grievance in June 2016, and made his posts on social media in 2017. These subsequent acts of speech cannot have motivated the previous determination to deny his promotion application. Additionally, the committee denied Howell's promotion

application because it determined that he did not qualify under the "exceptional" clause in the promotions guidelines. Howell may believe that the committee applied this standard erroneously, but he provides no evidence to suggest that his speech was a substantial factor in the committee's decision to apply the higher standard.

Furthermore, the undisputed evidence shows that Defendants would have denied Howell the promotion even if he had not made the speech at issue: Howell's application lacked the required number of student evaluations and adequate documentation of his scholarly activity. The Department committee, Chair Houlahan, and an independent University committee all reached the same conclusion: that Howell did not merit a promotion.

Second, Howell cannot prove that his speech motivated Defendants' decision not to entrust him with the full duties of Director of Choral Activities. Howell claims he became aware of his "demotion" during the May 9, 2016 faculty meeting. This meeting predates his union grievance and his social media posts, so he cannot prove that those complaints motivated Defendants' decision. Additionally, Defendants have met their burden of proving that the Department did not consider Howell the Director of Choral Activities and did not give him all the performance opportunities he desired, not because of any protected speech he made, but because they considered him unqualified and had received complaints about the quality of his ensemble direction. Howell has provided no evidence that Defendants would have allowed him the full duties of Director of Choral Activities, such as directing the auditioned choirs, if he had not engaged in the allegedly protected speech.

Third, Defendants provide undisputed evidence that the two Article 42/43 investigations of Howell have no relation to his speech. The University initiated the first because they received complaints that Howell was providing inadequate supervision to music student teachers, a

serious liability to a successful music program. The second focuses, not solely on Howell's Facebook post as he describes it, but on complaints that he behaved unprofessionally and harassed a student in class. The record makes clear that even if Howell had made none of the alleged protected statements, the Article 42/43 investigations still would have occurred, because these reports of Howell's misconduct justified a University inquiry into his professionalism.

Fourth, Howell does not dispute Dean Umble's reasons for the interim evaluation: his lack of recent scholarship and service. He contends only that the evaluation imposes a burden on him and allegedly often leads to dismissal, but he proves no link between the decision for the evaluation and his alleged protected conduct.

Lastly, with respect to the "punitive" schedule involving large general education classes, Howell was assigned the schedule for the Fall 2016 and Spring 2017 semesters. Thus, his classes were already assigned when he wrote his social media posts in early 2017, and he cannot prove that those posts were a substantial factor in the Defendants' decision to assign him large general education classes. Howell contends that no other faculty member has to teach as many students as he does. Even assuming that this is true, the Defendants have produced evidence that Howell would be teaching these classes anyway: they are the only ones he is qualified for, and professors often have to teach large general education classes or classes with which they have no experience.

In sum, Howell therefore has failed to carry his burden on his First Amendment claim because he cannot prove that any of his speech was a substantial factor in a retaliatory action. Additionally, Defendants have produced adequate evidence that every one of the allegedly

retaliatory actions would have occurred even if Howell had never voiced any criticisms of the Department. Therefore, the Court grants Defendants' motion for summary judgment.[10]

### E.      Defendants' Motion to Dismiss Millersville University

Because the Court grants summary judgment with respect to all of Howell's claims against the individual Defendants in both their individual and official capacities, no claims exist against Millersville University, and Defendants' Motion to Dismiss is granted.[11]

## V.      CONCLUSION

For the foregoing reasons, Defendant's Motion to for Summary Judgment is granted, and Defendants' Motion to Dismiss the Third Amended Complaint in Part Against Millersville is granted. A separate Order will issue.


                                                        BY THE COURT:



                                                        */s/ Joseph F. Leeson, Jr.*
                                                        JOSEPH F. LEESON, JR.
                                                        United States District Judge

---

[10]      Because Howell's First Amendment claim fails on the merits, the Court does not address the issue of Defendants' qualified immunity.
[11]      The Third Amended Complaint does not assert any separate count against Millersville University. ECF No. 39. Plaintiff opposes the Motion to Dismiss solely on the official capacity claims against the individual Defendants. ECF No. 56.